Bullard, J.
A branch of this cause was before us at the last term, (9 Rob. 438,) and the decision then rendered, was confined to the question whether a fund of about $ 14,000, which had been deposited in the Commercial Bank, was to be considered as belonging to the community, and applicable in the hands of the executor to the payment of the debts.
The present appeal relates to another part of the opposition *360 made by some of the heirs, to the account rendered by the executor, in which they allege, that the executor ought to account for one undivided half of a plantation and slaves situated in the parish of Plaquemine, and for half the revenues of it during the years 1840, 1841, 1842 and 1843. They allege, that this part of the plantation, not appearing on the inventory, was ostensibly sold, in the year 1840, to David Stewart, for one hundred thousand dollars, on a credit of one, two, three, four, five and six years ; but they allege and charge, that the sale was simulated, and that the said Stewart only held the property for Samuel Packwood, with a view of depriving these opponents of their legal rights to said property and its revenues ; and they further allege, that Stewart has lately retroceded said property to Pack-wood, and that said retrocession ought to enure to the benefit of the community, even if it should be decided that the sale was real ; that, at all events, the executor is bound to account for the $100,000, for which the property was sold to Stewart.
They further insist in their opposition, that the executor ought to have charged himself with $90,000, for which one-half of the plantation and slaves were sold to T. J. Packwood, which sum, or a greater part of it, the executor has received.
They further say, that the executor has not accounted for 505 shares in the Union Bank, belonging to the community.
They object to the commissions allowed to McBride, for collecting rents.
They allege, that the executor has not deposited, any of the funds which he has received, and for which he is' accountable, in an incorporated bank paying interest on deposites, but has applied the funds to his own use, and is therefore bound to pay twenty per cent damages.
These oppositions were sustained, and the executor appealed.
It is proper first to say, that the court did not err in our opinion, in regarding the stock in the Union Bank, secured on real estate, and acquired before the removal of Packwood and his wife from Louisiana, as a part of the community, one-half of which, consequently belongs to the estate of Alice Packwood. Although perhaps moveable, according to art. 466 of the Civil Code, yet it has the same situs with the immoveable upon which *361 it forms a charge; its transfer has to be made on the books of the Bank situated here. But whether it be considered as moveable, or as an incorporeal right, immoveable on account of its relating to real estate, according to art. 462, it belonged to the community here, at the death of Alice Packwood.
But we are of opinion, that the commissions paid by the executor, to the person who was employed by him to collect the rents, ought to have been allowed to him, as charged in his account.
Having disposed of the two last grounds of opposition, we come to consider whether the sale to Stewart, by Packwood and his wife, after they removed from Louisiana, was simulated, and, as alleged, with a view of depriving the children of the vendors, of their just rights; and whether such parts of the price of the other half, which had been sold to Theodore J. Packwood before the removal of his parents from Louisiana, received afterwards by Packwood in New York, must be regarded as a community fund in his hands, to be administered here, and for which he is accountable, as a part of the estate of Alice Packwood in this State.
Nearly the whole ground travelled over in argument, when the other branch of the case was before us, has been again explored; but notwithstanding the ability and learning displayed at the bar, the counsel have failed to convince us, that we were in error in adopting, as we did on that occasion, the following propositions, as well founded in law.
1. On the removal of Packwood with his wife, to reside here, in 1804, the law then in force establishing and regulating the matrimonial community of gains, operated upon the property acquired during their residence here, and it became community property.
2. On their change of domicil, in 1836, by returning to reside in a State where a different law prevails, the community law of Louisiana ceased to operate as to future acquisitions of property, whatever may be the effect of such removal as to property previously acquired, during their residence in this State.
3. That the executor here administers only on the property in Louisiana, belonging to the testatrix; and whatever estate Mrs. *362 Packwood may have left in New York is to descend, and to be administered, according to the law of that State.
4. That on the change of domicil in 1836, the title to the property already acquired here, did not vest in the parties each for one undivided half, separately from the other, but the husband, so long as the marriage existed, retained his power over it; that it was subject to his debts contracted aftei-, as well as before the change of domicil, and that he had a right to enjoy the fruits of the property, and to sell it without fraud, and that no distinct separate interest vested in Mrs. Packwood before the dissolution of the marriage by her death; and that, at that period, one-half of whatever property still existed, which had been acquired during the residence of the parties in this State, vested in her heirs, subject to the payment of one-half of the debts contracted during the marriage.
The degree of interest or title, which the wife hasin the property acquired during the existence of the community before its dissolution, has been much discussed. It is clear, however, that she has a kind of right susceptible of being defeated by a fraudulent alienation by the husband ; a title defeasable by her option not to accept the community, and become liable for one-half of its charges. By the customary law of France, when the husband was guilty of a crime punishable with death and confiscation, the half of the property to which the wife would be entitled on the dissolution of the community, was not confiscated ; on the other hand, when the wife was condemned, her contingent share in the community was not forfeited, according to the better opinion of the jurists, and particularly that of D’Aguesseau. Merlin, Rep. verbo, Communauté, § 5.
The argument of the counsel for the appellees, that the law of community of the place where the acquests have been made, is equivalent to an actual written marriage settlement, in which all the provisions of the law of that country were word for word inserted, and consequently, that the act of the parties changing their domicil can have no effect on the rights acquired by marriage contract, proves too much for his clients • for if that be the case, then the marriage settlement resulting from thelawsof Connecticut, the matrimonial domicil of the parties originally, would *363 continue to operate, as matter of contract, notwithstanding their first change of domicil, and the consequence would be, that the wife would only have her dower in lands acquired here according to the common law. A change of domicil does not appear to us to imply a modification of matrimonial conventions. On the contrary, the law operates upon all persons within the State, and imparts to property acquired by man and wife, while under the operation of those laws, the charac ter of community property according to the definition of the Codes; and the wife acquires in it that species of interest or title of -which we have spoken ; when they cease to reside here, the law ceases to operate as to their future acquisitions, although a change of domicil does not involve a loss of the inchoate rights of the wife in the property acquired, nor does it, in our opinion, operate to vest in the wife irrevocably her share of the acquests, separately from the husband. It is the property found at the dissolution of the marriage, which constitutes the body of acquests and gains.
We have said, that the executor, acting under the authority of the Court of Probates, though named as such in a will written in New York, administers only on the estate of Alice Packwood* situated in Louisiana. What estate she may have left elsewhere, aud what effect the same will may have as to her property situated elsewhere, it does not concern us to inquire. The principal question with us, is, what constituted the estate of Alice Pack-wood in Louisiana, at the time of her decease ? Our own laws are to determine what constitutes her succession here, and that alone is to be administered by her executor. Her succession may be, as has been contended, an entire thing; but that is not inconsistent with the principle that different parts of it, situated in different States, may be administered separately ; and nothing can be more manifest than that Packwood, acting here as executor, cannot be compelled to account for anything which the heirs of his wife may allege, formed a part of the estate not situated here.
This brings us to the principal inquiry in the present case, to wit, whether the sale to Stewart of an undivided half of the plantation and slaves in the parish of Plaquemine, was simulated, and made with a view of depriving the children of their legal rights, or, in other words, fraudulent.
•One-half of the plantation had been previously sold to their *364 son, T. J. Paekwood, and there is no dispute about the title to that part. When the parties moved to New York, in 1836, they still owned the other half. In 1840, Paekwood sold that half to David Stewart, for $100,000, payable in six equal annual instal-ments, for which notes were given secured by mortgage, to bear interest at seven per cent, if not punctually paid. This deed was signed by Alice Paekwood, as well as her hnsband, at New York ; and was duly recorded in the parish of Plaquemine, where the property is situated. Theodore J. Paekwood, one of the heirs, afterwards brought a suit against Stewart for a partition of the property. In 1843, Stewart reconveyed the property to Pack-wood, and the notes were cancelled. It further appears, that in 1834, Paekwood had sued Stewart for a part of the price by attachment, and that Theodore J. Paekwood was garnished and paid over, after judgment, upwards of $9000 to the plaintiff’s attorney.
This part of the case, which relates to the fraudulent character of the sale to Stewart, if it has any legal foundation, is founded on art. 2373 of the Civil Code, which provides, that “ if it should be proved that the husband has sold the common estate, or otherwise disposed of the same by fraud, to injure his wife, she may have her action against the heirs of her husband, in support of her claim in one-half of the estate, on her satisfactorily proving the fraud.”
The Spanish law puts the action in such a case, upon the same footing with the revocatory action generally to annul fraudulent contracts; and the sale or other disposition of property made by the husband, must be shown to be made “ dolose ut uxor prive-tur sua parte f or, as our Code expresses it, “ by fraud to injure his wife.” Gomez ad Leges Tauri. No. 72 and 74.
Although the Code speaks of such an action being given against the heirs of the husband, as if it did not contemplate an action against him personally by the heirs of the wife, yet conceding, what is by no means clear, that such an action can be maintained during the lifetime of, the husband, by his own children, as heirs of his wife, let us inquire what are the proofs offered in the case before us.
The case does not certainly present the usual indicia of fraud. *365 The wife, with whom the appellant appears to have lived harmoniously, joined in the act and signed the deed. The presumptive heirs of both parties were the same persons — the issue of their marriage. They had lived together nearly forty years. One of the children regarded the sale as bona fide, and not wishing to hold the plantation in partnership with Stewart, sued for a partition. Packwood retained a mortgage on the property, and sued for a part of the price, recovered a judgment, and was paid by his son, as a garnishee, the amount claimed. It is difficult to discover in this an intention on the part of Packwood to defraud his wife, who joined him in the sale. The children who make this allegation liad, at that time, no interest and no right, which could be affected by the transaction. It was only at the death of Alice Packwood that they acquired any right. Suppose the re-trocession had never taken place, and they had sued for the property itself, as in the ordinary revocatory action, could not Stewart have opposed to them the act of Alice Packwood herself, whose heirs they are, and whose contracts they are bound to warrant 1 It is not enough that the sale to Stewart was merely simulated ; it must be shown to have been made to injure the wife, and to deprive her of the share in the common property, to which she would have been otherwise entitled ; nor is it enough, that the contract was made with the full consent of Mrs. Packwood, with a view to favor, ultimately, a part of the children to the prejudice of others; if that should be supposed to be the motive of the parties, the children have no right to complain of that as a fraud. Upon the retrocession of the property, the title vested in Pack-wood alone. If Mrs. Packwood had any interest in the notes which were restored to Stewart, as the consideration for which the sale was cancelled, it is not here that the appellant is to account for it; inasmuch as both parties lived in New York at the time, and the fund does not belong to the community in this State. The retrocession to Packwood took place in July, 1843, several years after the death of his wife, and when they had been both domiciled in New York for many years.
It is further contended, that Packwood is bound to account here, to his children, for the sum of $90,000, the price for which he sold the other half of the plantation to his son during the exis- *366 tenee of the community. It is quite obvious, according to the principles already set forth in this and in the other branch of the ease, that the price of that part of the property did not exist here at the death of Alice Packwood, and does not form a part of the community to be settled here: and that the appellant is no more accountable for that transaction, during the lifetime of his wife, than for the price of any other property which he may have sold before the dissolution of the community.
Personal property has no other situs than the domicil of the owner.
JRoselius, for a re-hearing,
contended, that by the cancelling of the sale to Stewart, the property was re-invested in the original vendor, as if no sale had been made. Power v. Ocem Ins. Co. 19 La. 30. That at the time of the sale, the property belonged to the community, and by the retrocession again became vested in it. That the dissolution of the community by Mrs. Packwood’s death, could not affect the question as to what property belonged tó the community ; and that its effect was limited to preventing .any future acquisitions.
*366 The counsel for the appellees speak of the will of Mrs. Pack-wood as a disinherison of her children in disguise, as if dictated or suggested by her husband, for his benefit. Of this we have no information; but it should not be forgotten, that real estate situated here to a large amount, appears in the inventory, as belonging to the community, which Packwood had a right to sell at any moment before the death of his wife, but which remains, and one-half is admitted to belong to his children in the right of their mother, of the value of more than $>50,000. The share of the wife in that property was not disposed of by her will; and, in fact, the will left whatever property the testatrix may have possessed at her death, in this State, to descend as if she had died intestate. .
It is, therefore, ordered and decreed, that the judgment of the Court of Probates be reversed; and it is further ordered, that the opposition, so far as it relates to the Union Bank stock, be sustained, and that in all other respects it be overruled and rejected : and that the account rendered by the executor, being thus amended, be approved and homologated; that the opponents pay the costs of the appeal, and that all other costs be paid by the community.